2014-1510

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS,

Appellant,

v.

MICRON TECHNOLOGY, INC.,

Appellee.

---

Appeal from the United States Patent and Trademark Office before the Patent Trial and Appeal Board in case no. IPR2013-00006, Administrative Patent Judges Sally Gardner Lane, Bryan F. Moore, and Michael J. Fitzpatrick

---

**BRIEF OF APPELLANT
THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS**

---

Rolf O. Stadheim
George C. Summerfield
STADHEIM & GREAR LTD.
400 North Michigan Avenue
Suite 2200
Chicago, Illinois 60611
Telephone: (312) 755-4400
Facsimile: (312) 755-4408

*Attorneys for Appellant, The Board of Trustees of the University of Illinois*

July 29, 2014

## CERTIFICATE OF INTEREST

Pursuant to Fed. Cir. R. 47.4, counsel for appellant, The Board of Trustees of the University of Illinois, certifies the following:

(1)    The full name of every party or amicus represented by me is: The Board of Trustees of the University of Illinois.

(2)    The name of the real party in interest represented by me is: The Board of Trustees of the University of Illinois.

(3)    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

(4)    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Rolf O. Stadheim
George C. Summerfield
Stadheim & Grear, Ltd.
400 North Michigan Avenue
Suite 2200
Chicago, Illinois 60611

*/s/ George C. Summerfield*
George C. Summerfield

i

# TABLE OF CONTENTS

*Page(s)*

CERTIFICATE OF INTEREST                                        i

TABLE OF CONTENTS                                              ii

TABLE OF AUTHORITIES                                          iii

STATEMENT OF RELATED CASES                                     1

JURSIDICTIONAL STATEMENT                                       2

STATEMENT OF THE ISSUE                                         3

STATEMENT OF THE CASE                                          4

STATEMENT OF FACTS                                             5

SUMMARY OF ARGUMENT                                           8

STANDARD OF REVIEW                                            9

ARGUMENT                                                      10

CONCLUSION AND RELIEF SOUGHT                                  14

# TABLE OF AUTHORITIES

*Cases*                                                          *Page(s)*

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,                           11
661 F.3d 629 (Fed. Cir. 2011)

*Callaway Golf Co. v. Acushnet Co.*,                                 10
576 F.3d 1331 (Fed. Cir. 2009)

*Cont'l Can Co. USA v. Monsanto Co.*,                                11
948 F.2d 1264 (Fed. Cir. 1991)

*Graham v. John Deere Co. of Kansas City*,                           10
383 U.S. 1 (1966)

*In re Glaug*,                                                       12
283 F.3d 1335 (Fed. Cir. 2002)

*In re Oelrich*,                                                     11
666 F.2d 578 (C.C.P.A. 1981)

*In re Omeprazole Patent Litig.*,                                    11
483 F.3d 1364 (Fed. Cir. 2007)

*In re Sullivan*,                                                     9
498 F.3d 1345 (Fed. Cir. 2007)

*Randall Mfg. v. Rea*,                                                9
733 F.3d 1355 (Fed. Cir. 2013)

*Schering Corp. v. Geneva Pharms., Inc.*,                            11
339 F.3d 1373 (Fed. Cir. 2003)

*Therasense, Inc. v. Becton, Dickinson & Co.*,                       11
593 F.3d 1325 (Fed. Cir. 2010)

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,                          11
295 F.3d 1292 (Fed. Cir. 2002)

# TABLE OF AUTHORITIES

***Cases***                                                                   ***Page(s)***

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*,                              10, 11
602 F.3d 1325 (Fed. Cir. 2010)

***Statutes and Other Authorities***

28 U.S.C. § 1295                                                                   2

35 U.S.C. § 103                                                                    9

## STATEMENT OF RELATED CASES

There are two companion appeals to the instant appeal, Appeal Nos. 2014-1509 and 2014-1511.

## JURISDICTIONAL STATEMENT

This Court's jurisdiction over this appeal is governed by 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUE

Whether the Board erred in finding that the limitation from claim 13 of U.S. Patent No. 6,888,204 ("the '204 Patent") "said post-fabrication passivation being conducted sufficiently to provide to said transistor a practical lifetime at least about ten times that provided by a corresponding passivation with hydrogen" is necessarily found in WO94/19829 to Lisenker, *et al.* ("Lisenker"), such that this limitation is inherent in that reference.

3

## STATEMENT OF THE CASE

On December 5, 2011, Appellant, The Board of Trustees of The University of Illinois ("the University") filed suit for patent infringement in the United States District Court for the Central District of Illinois, asserting three patents, including the '204 Patent, against Appellee, Micron, Inc. ("Micron").  On October 2, 2012, Micron filed petitions for *inter partes* review of the '204 Patent.  On March 10, 2014, the Board issued a final determination canceling claims 1-18 of the '204 Patent, given their obviousness in light of, *inter alia*, Lisenker.[1]

---

[1] The University only appeals from the final determination pertaining to claim 13 of the '204 Patent.

## STATEMENT OF FACTS

The '204 Patent solves a problem known as "hot carrier effects" at the interface of the silicon and insulator layers of a semiconductor device. Hot carrier effects in a semiconductor device occur when channel carriers become sufficiently energetic and enter the insulator layer, which degrades the device. (A105, column 2, lines 43-51.) The '204 Patent discloses results comparing wafer samples annealed in a deuterium ambient with wafer samples annealed in a hydrogen-based ambient, demonstrating that "transistors sintered in deuterium typically exhibit lifetimes 10 times longer than those sintered in hydrogen." (A108, column 7, lines 41-51.)

Claim 13 of the '204 Patent explicitly requires this 10-fold increase in device lifetime:

> A semiconductor device comprising a field effect transistor having an interface between a semiconductive silicon layer and a gate insulating layer, structurally characterized by the gate insulating layer having a thickness not exceeding about 55 Angstroms and by the presence of deuterium at said interface resulting from post-fabrication passivation of said interface in a heated, deuterium gas-enriched atmosphere at a temperature above about 200° C. so as to increase the resilience of the field effect transistor to hot electron effects, ***said post-fabrication passivation being conducted sufficiently to provide to said transistor a practical lifetime at least about ten times that provided by a corresponding passivation with hydrogen***, wherein practical lifetime is taken as 20% transconductance degradation as a result of electrical stress.

(A108, column 8, line 64 – column 9, line 11 (emphasis added).)

5

In the proceeding below, the Board found that claim 13 of the '204 Patent was "similar to claim 1" of that patent. (A41.) The Board also found that Lisenker anticipated claim 1. (A49.) Claim 1, however, does not contain the 10-fold lifetime increase limitation found in claim 13. (A108, column 7, line 63 – column 8, line 9.) Otherwise, with regard to claim 13, the Board found that "it would have been apparent to one of ordinary skill in the art to reduce the thickness of the gate insulating film of Lisenker to about 55 Angstroms or less." (A41.) The Board ultimately found that claim 13 was rendered obvious by Lisenker. (A49.) Nowhere in its Final Determination did the Board say anything about the 10-fold lifetime increase required by claim 13.

The Board did find with regard to claim 1 that "increased resilience to hot electron effects is an inherent result of greater deuterium retained at the interface" (a limitation of that claim). (A37.) The Board also apparently relied upon the '204 Patent itself as evidence of inherency. (A37 ("increased resilience to hot electron effects is an inherent result of greater deuterium retained at the interface . . . and, indeed, it is the basis of the claims of its patent").) At no time, however, did the Board tie this inherency finding to claim 13 generally, or to the 10-fold lifetime increase limitation specifically.

The University urged below that results from post-metallization passivation with deuterium cannot be inherent in Lisenker, which emphasizes deuterium

passivation **before** the formation of metal contacts on a semiconductor device, *i.e.*, pre-metallization annealing. (A35.) The Board merely found in response that Lisenker is not limited to pre-metallization annealing. (A35-36.) In other words, Lisenker was at best agnostic as to whether to perform passivation pre- or post-metallization.

If passivation takes place pre-metallization, there is no retention of deutrerium. (A35.) Micron's expert below agreed with this proposition. (A1006, ¶ 15.) Further, Micron's expert presented data purporting to replicate Lisenker's work, which reflected an improvement in device lifetime of as little as about three to four fold. (A1976-A1977, ¶ 23.) The University's expert, for his part, estimated that the improvement in device lifetime resulting from Lisenker was even more modest—1.2 to 2.5 times, which is far below the 10-fold lifetime claimed in the '204 Patent. (A1849-A1850, ¶ 29.)

## SUMMARY OF ARGUMENT

The Board said nothing about the limitation from claim 13 of the '204 Patent specifying a 10-fold increase in semiconductor device lifetime resulting from post-metallization deuterium annealing.  As such, its finding that claim 13 was obvious in light of the prior art was erroneous.  If the Board's finding that the "increased resilience to hot electron effects is an inherent result of greater deuterium retained at the interface" in Lisenker is somehow relevant to claim 13, that finding was also erroneous in light of experimental data reflecting results far below the claimed 10-fold increase presented by ***both*** parties' experts.  Further, as Lisenker teaches the use of pre- and post-metallization annealing as being effectively interchangeable (indeed Lisenker emphasizes pre-metallization annealing), the results obtained from post-metallization annealing claimed in the '204 Patent cannot be necessarily present when practicing Lisenker.  Finally, none of the reference combinations relied upon by the Board solves for the absence in Lisenker of the 10-fold lifetime improvement claimed in the '204 Patent.

## STANDARD OF REVIEW

The propriety of a decision of the Board cancelling a patent pursuant to 35 U.S.C. § 103 is a question of law with underlying issues of fact. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). This court reviews the Board's compliance with governing legal standards *de novo* and its underlying factual determinations for substantial evidence. *In re Sullivan*, 498 F.3d 1345, 1350 (Fed. Cir. 2007).

**ARGUMENT**

Under the four-part test for obviousness in *Graham v. John Deere*, one must consider, *inter alia*, "differences between the prior art and **the claims** at issue." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966) (emphasis added). This requirement involves a comparison of the prior art in question and all of the limitations of a challenged claim. *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1339-40 (Fed. Cir. 2009) (evaluating whether the prior art taught a "hardness" limitation, in addition to all other claim limitations, before holding that "[t]he evidence before the jury did not compel a finding that all claim limitations were present in the prior art"). In other words, any obviousness analysis that omits claim limitations in a comparison with the prior art cannot pass muster.

As explained in the University's Statement of Facts, the Board never mentioned the 10-fold lifetime increase limitation from claim 13. As such, the Board did not compare claim 13 in its entirety to Lisenker or any other prior art. Therefore, the Board's finding that claim 13 was rendered obvious by the prior art was erroneous.

The Board did find with regard to claim 1 that "increased resilience to hot electron effects is an inherent result of greater deuterium retained at the interface." (A37.) To the extent that this finding is determined to equate to the 10-fold lifetime increase limitation of claim 13, inherency requires that a limitation

expressly missing from a prior art reference be "necessarily present" in such reference. *Verizon Servs. Corp. v. Cox Fibernet Va., Inc*., 602 F.3d 1325, 1338 (Fed. Cir. 2010) (quoting *Schering Corp. v. Geneva Pharms., Inc*., 339 F.3d 1373, 1377 (Fed. Cir. 2003)); *see also In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1378 (Fed. Cir. 2007); *Trintec Indus., Inc. v. Top-U.S.A. Corp*., 295 F.3d 1292, 1295 (Fed. Cir. 2002).

The inherent result must inevitably result from the disclosed steps. "'Inherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient.'" *Bettcher Indus., Inc. v. Bunzl USA, Inc*., 661 F.3d 629, 639 (Fed. Cir. 2011) (quoting *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981)) (emphasis added); *see also Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010); *Cont'l Can Co. USA v. Monsanto Co*., 948 F.2d 1264, 1269 (Fed. Cir. 1991).

As explained in detail in the University's Statement of Facts, given the technical analyses of the parties' respective experts reflecting lifetime improvements of as little as 1.2 to 3 fold, there is a serious question as to whether one practicing Lisenker *ever* (let alone inevitably) would obtain the 10-fold lifetime improvement claimed in the '204 Patent. Further, as Lisenker's teachings are not limited to post-metallization annealing, and given that results differ

11

fundamentally when annealing occurs pre- versus post-metallization, the results obtained when practicing Lisenker's teachings are anything but consistent. The 99:1 ratio of deuterium to hydrogen cited by the Board from a single claim in Lisenker does not convert the inconsistent into the consistent.

The purported improvement in resilience that the Board deemed inherent in Lisenker is a possibility at most. It is certainly not a necessity, as is required for a feature purportedly inherent in the prior art. Thus, the Board erroneously determined that Lisenker inherently yields the claimed improvement, and that determination, to the extent it is found relevant to claim 13, was erroneous.

As noted above, the Board's apparent "evidence" of the purported inherent lifetime improvement was the '204 Patent itself. However, "[a]n inventor's explanation of how the invention works does not render obvious that which is otherwise unobvious." *In re Glaug*, 283 F.3d 1335, 1341 (Fed. Cir. 2002). According to this Court, the patent's own "teaching that the spacing permits the fabric to bunch and stretch is not evidence of obviousness." *Id.* If anything, that teaching "supports the unobviousness of [the patentee's] discovery." *Id.* Given that its ***only*** evidence of inherency is found in the '204 Patent, the Board's obviousness determination was erroneous.

The Board also made findings regarding the obviousness of claim 13 of the '204 Patent in light of combinations of prior art references. (A43-A48.) However,

the Board did not rely on any of these combinations to satisfy the increased lifetime limitation from that claim, either by inherency or otherwise.

The Board also relied upon certain prior art combinations to arrive at post-metallization passivation using deuterium. (A43-A44 (Lisenker in view of Gise).) However, nowhere does the Board explain the motivation to combine these references. And given Lisenker's failure to distinguish between pre- and post-metallization annealing in achieving the reported superior results, there would have been no motivation for one of ordinary skill in the art reading Lisenker to have sought out other references teaching post-metallization annealing specifically.

Finally, there is no evidence that one skilled in the art practicing any of these combinations would have *necessarily* obtained the claimed enhanced practical device lifetime. Indeed, as there is no evidence that anyone actually employed any such combination, predicting the results therefrom would be mere speculation.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, the University respectfully requests that the cancellation of claim 13 of U.S. Patent 6,888,204 be vacated and that the matter be remanded to the Board for further action consistent with such *vacatur*.

Respectfully submitted,

*/s/ George C. Summerfield*
George C. Summerfield
Rolf O. Stadheim
STADHEIM & GREAR, LTD.
400 North Michigan Avenue
Suite 2200
Chicago, Illinois 60611
Telephone: (312) 755-4400
Facsimile: (312) 755-4408

*Attorneys for Appellant, The Board of*
*Trustees of the University of Illinois*

14

**ADDENDUM**

## ADDENDUM

Final Written Decision (Paper No. 48) (March 10, 2014)...........................A22-A51

U.S. Patent No. 6,888,204…………………………………………………A100-A110

Trials@uspto.gov                                    Paper No. 48
571.272.7822                                       March 10, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

MICRON TECHNOLOGY, INC.
Petitioner

v.

THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS
Patent Owner

———————

Case IPR2013-00006
Patent 6,888,204 B1

———————

Before SALLY GARDNER LANE, BRYAN F. MOORE, and
MICHAEL J. FITZPATRICK, *Administrative Patent Judges.*

FITZPATRICK, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318 and 37 C.F.R. § 42.73*

Case IPR2013-00006
Patent 6,888,204 B1

## BACKGROUND

Micron Technology, Inc. ("Micron") filed a Petition (Paper 3, "Pet.") requesting an *inter partes* review of all claims (i.e., claims 1-18) of U.S. Patent No. 6,888,204 B1 (the "'204 patent"). The Board of Trustees of the University of Illinois ("University") filed a Patent Owner Preliminary Response (Paper 11, "Prelim. Resp."). In a March 13, 2013, Decision to Institute (Paper 15, "Dec. on Pet."), the Board granted the Petition and instituted trial of all claims on the following grounds:

claims 1, 2, 4, and 5 as anticipated by Lisenker (Ex. 1004)[1];

claims 1, 2, 4-7, 9-16, and 18 as obvious over Lisenker;

claims 1, 2, 4-7, 9-16, and 18 as obvious over Lisenker and Gise (Ex. 1010)[2];

claim 3 as obvious over Lisenker, Gise, and Nicollian (Ex. 1012)[3];

claims 6-18 as obvious over Lisenker, Gise, and Ito (Ex. 1008)[4];

claim 10 as obvious over Lisenker, Gise, Ito, and Mikawa (Ex. 1005)[5].

claims 1-5 as obvious over Deal (Ex. 1009)[6] and Lisenker; and

claims 6-18 as obvious over Deal, Lisenker, and Ito.

Dec. on Pet. 27.

---

[1] WO 94/19829 to Lisenker et al. (Sep. 1, 1994).

[2] PETER GISE & RICHARD BLANCHARD, SEMICONDUCTOR AND INTEGRATED CIRCUIT FABRICATION TECHNIQUES 129-131 (Reston Publishing Co., Inc. 1979).

[3] E.H. NICOLLIAN, *Electrical Properties of the Si-SiO$_2$ Interface and its Influence on Device Performance and Stability*, 14(5) J. VAC. SCI. TECHNOL. 1112 (Sept./Oct. 1977).

[4] US 4,980,307 to Ito et al. (Dec. 25, 1990).

[5] R.E. MIKAWA & P.M. LENAHAN, *Electron Spin Resonance Study of Interface States Induced by Electron Injection in Metal-Oxide-Semiconductor Devices*, 59 (6) J. APPL. PHYS. 2054 (Mar. 15, 1986).

[6] US 4,027,380 to Deal et al. (June 7, 1977).

2

Case IPR2013-00006
Patent 6,888,204 B1

After institution, the University filed a Patent Owner Response (Paper 24, "PO Resp."). In it, the University opposes the grounds of unpatentability on two general bases: (1) the Board's findings, in instituting trial, regarding Lisenker are incorrect; and (2) objective indicia prove the claims would not have been obvious. Micron filed a Reply (Paper 26). Oral hearing was held on December 9, 2013.[7]

The Board has jurisdiction under 35 U.S.C. § 6(c). This final written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and arguments raised during the trial. Issues and arguments raised prior to institution of trial, but not made during trial, are not addressed necessarily in this Decision.

As discussed below, Micron has shown by a preponderance of the evidence that claims 1-18 of the '204 patent are unpatentable.

A.    Related Proceedings

Micron indicates that it is a named defendant in a pending district court case concerning the '204 patent brought by the University and captioned *The Board of Trustees of the University of Illinois v. Micron Technology, Inc.*, Case No. 2:11-cv-02288 (C.D. Ill.). Pet. 1.

Also, Micron filed two additional petitions, which we granted, for *inter partes* reviews of two related patents: IPR2013-00005, regarding U.S. Patent No. 6,444,533, and IPR2013-00008, regarding U.S. Patent No. 5,872,387.

---

[7] A transcript of the final hearing is included in the record.

3

Case IPR2013-00006
Patent 6,888,204 B1

B.    The '204 Patent (Ex. 1002)

The '204 patent, titled "Semiconductor Devices And Methods For Same," is assigned to the University. Ex. 1002, 1. The '204 patent issued from U.S. Application Serial No. 09/160,657, filed September 25, 1998. *Id.*

The '204 patent "relates to methods for treating semiconductor devices or components thereof in order to reduce the degradation of semiconductor device characteristics over time." Ex. 1002, col. 1, ll. 22-25. In particular, the '204 patent discloses methods of treating a semiconductor device by passivation of (or annealing[8]) the device with deuterium, an isotope of hydrogen. *Id.* at col. 2, ll. 36-39; Prelim. Resp. 1. The '204 patent explains:

> [T]reatment with deuterium provides a reduction in the depassivation or "aging" of semiconductor devices due to hot-carrier effects. Such aging is evidenced, for example, by substantial degradations of threshold voltage, transconductance, or other device characteristics. In accordance with the present invention, semiconductor devices are fabricated using deuterium to condition the devices and stably reduce the extent of these degradations.

Ex. 1002, col. 3, ll. 40-48.

Prior to the '204 patent, passivation with hydrogen[9] was "a well-known and established practice in the fabrication of semiconductor devices" to remove defects that affect the operation of the devices. Ex. 1002, col. 1, ll. 26-28; Ex. 1001 (Reed Decl.) ¶¶ 13-14. According to the '204 patent, it

---

[8] Micron's witness testified that passivation is also referred to as annealing. Ex. 1001 (declaration of Michael L. Reed, Ph.D. ("Reed Decl.")) ¶ 14.

[9] Our use of the term "hydrogen" and the symbol "H" in this Decision refers to naturally occurring hydrogen, which we understand to be predominantly protium, but may include trace amounts of deuterium.

4

Case IPR2013-00006
Patent 6,888,204 B1

was "discovered that semiconductor devices, for example including MOS[10] devices, can be advantageously treated with deuterium to improve their operational characteristics." Ex. 1002, col. 2, ll. 32-36.

C.    Illustrative Claim

Independent claim 1 is illustrative of the claimed subject matter and reads as follows:

> 1.    A semiconductor device comprising an n-channel field effect transistor including a drain formed in a semiconductive layer, a source formed in said semiconductive layer, a channel extending between the drain and the source, a gate insulating layer over said channel, an interface between a semiconductive silicon layer and a gate insulating layer, and conductive contacts to said drain, source and on said gate insulating layer, said field effect transistor structurally characterized by the retention or deuterium at said interface resulting from post-fabrication passivation of said interface in a heated, deuterium gas-enriched atmosphere at a temperature above about 200° C. so as to increase the resilience of the field effect transistor to hot electron effects during operation.

ANALYSIS

A.    Claim Construction

In an *inter partes* review, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b). That construction must be consistent with the specification, and the claim language should be read in light of the specification, as it would be interpreted by one of ordinary skill in the art. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir.

_____

[10] MOS refers to metal oxide semiconductor. Ex. 1002, col. 1, ll. 44-45; Ex. 1001 ¶ 9.

5

Case IPR2013-00006
Patent 6,888,204 B1

2010).  Thus, we give claim terms their ordinary and customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted).

In instituting trial, we gave each claim term its broadest reasonable interpretation, as understood by one of ordinary skill in the art and consistent with the disclosure of the '204 patent, as neither party had argued persuasively that any claim or term should be construed otherwise.  Micron pointed out that the claims should be interpreted as product-by-process claims.  Pet. 13.  We agree.

   *1.    Claim 1*

Claim 1, as corrected by a December 20, 2005, Certificate of Correction (Ex. 1003, 569), states:

> 1.    A semiconductor device comprising an n-channel field effect transistor . . .  structurally characterized by the retention of deuterium at said interface *resulting from post-fabrication passivation of said interface in a heated, deuterium gas-enriched atmosphere at a temperature above about 200° C.* so as to increase the resilience of the field effect transistor to hot electron effects during operation (emphasis added).

"[E]ven though product-by-process claims are limited by and defined by the process, determination of patentability is based on the product itself." *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985).  Thus, for patentability purposes, we look to the product claimed, not the process by which it is made.  *See id.* ("If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even

though the prior product was made by a difference process."); *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1366 (Fed. Cir. 2009) ("It has long been the case that an old product is not patentable even if it is made by a new process.") (citing *General Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 373 (1938)). Claim 1 requires retention of deuterium at the interface. A reference teaching retention of deuterium at the interface meets this requirement even if formed by a process different than that which is recited, unless evidence is put forth establishing an unobvious difference between the claimed product and the prior art product. *See In re Marosi*, 710 F.2d 799, 803 (Fed. Cir. 1983).

The University maintains that the specific process recited by claim 1 (post-fabrication passivation in deuterium) is required by the claim under an exception to the product-by-process rule. PO Resp. 20 (citing *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261 (Fed. Cir. 2012)). In *Greenliant*, the court held:

> [T]here is an exception to this general rule that the process by which the product is made is irrelevant. . . . [I]f the process by which a product is made imparts structural and functional differences distinguishing the claimed product from the prior art, then those differences are relevant as evidence of no anticipation although they are not explicitly part of the claim.

*Greenliant*, 692 F.3d at 1268 (quotation marks omitted). The University alleges that the process recited in claim 1 imparts a structural and functional difference resulting in a lifetime extension of the semiconductor device of between 10 and 50 times. PO Resp. 21. In support, the University refers to "experimental data included in the specification of the '204 patent" but does not provide a citation. *Id.* In fact, the experimental data in the Specification does not link lifetime extension to *post-fabrication* passivation with

7

Case IPR2013-00006
Patent 6,888,204 B1

deuterium. Rather, it links lifetime extension to deuterium passivation in general (i.e., as opposed to the prior art method using hydrogen). *See* Ex. 1002, Figs. 2-3, col. 5, ll. 60-65 ("[D]ramatic decreases in the degradation of threshold voltage and transconductance are observed when deuterium is used to passivate the devices, as compared to hydrogen passivation (see FIGS. 2 and 3, respectively). These decreases represent practical lifetime improvements by factors of about ten to fifty . . . ."); col. 7, ll. 47-49 ("[T]ransistors sintered in deuterium typically exhibit lifetimes 10 times longer than those sintered in hydrogen.").

Although claim 1 requires retention of deuterium at the interface, a reference teaching retention of deuterium at the interface meets this requirement even if formed by a process different than that which is recited, unless evidence is put forth establishing an unobvious difference between the claimed product and the prior art product. *See In re Marosi*, 710 F.2d at 803.

　　2.　*Claims 6, 10, 13, 14, and 15*

Each of independent claims 6, 10, 13, 14, and 15 is directed to a product that is defined, partially at least, by a recited process similar to the process in claim 1. Claims 6, 10, 13, and 14 require deuterium at the "interface" and claim 15[11] requires deuterium at the "interposed gate insulator film," but not as a result of any particular process. *See Thorpe*, 777 F.2d at 697; *Amgen*, 580 F.3d at 1366.

---

[11] Claim 15 was corrected by the December 20, 2005 Certificate of Correction. Ex. 1003, 569.

8

### 3.    Claim 9

Claim 9 is dependent from claim 6 and additionally recites "deuterium atoms from said post-fabrication passivation covalently bonded at said interface." This too is a product-by-process limitation, which requires deuterium atoms covalently bonded at the interface, but not as a result of any particular process. *See Thorpe*, 777 F.2d at 697; *Amgen*, 580 F.3d at 1366.

### B.    Prior Art References In Trial

### 4.    Lisenker (Ex. 1004)

Lisenker discloses "a method for producing semiconductor devices in which hydrogen-containing bonds in silicon dioxide are replaced with deuterium containing bonds. Specifically Si-H bonds are replaced with Si-D bonds and Si-OH bonds are replaced with Si-OD bonds." Ex. 1004, 5, l. 36 – 6, l. 3. Lisenker further discloses how the method may be carried out, stating:

> a silicon wafer is contacted with a deuterium containing material to form Si-D and Si-OD bonds in a silicon dioxide layer and on a silicon surface at an interface with the silicon dioxide layer. Typical silicon dioxide layers suitable for treatment according to the present invention include isolation oxides, gate oxides, and various other oxide layers commonly used with semiconductor devices. According to the invention, deuterium or a deuterium-containing material is directed onto the device by, for example, annealing in a deuterium containing atmosphere, and/or cleaning with a deuterium compound such as $D_2O$, $D_2SO_4$, and DCl. In general, any hydrogen containing material used in VLSI[12] fabrication can be replaced with corresponding deuterium containing material.

*Id*. at 4, ll. 20-34. Finally, Lisenker discloses the benefits of the method and

---

[12] VLSI stands for "very large scale integration." Ex. 1011 (THOMAS E. DILLINGER, VLSI ENGINEERING 4 (Prentice Hall, 1988)).

how those benefits are obtained, stating:

> The stability of oxide layers is improved in the present invention because the bond energy of the Si-H and Si-OH bonds is increased by replacing the hydrogen atoms with deuterium atoms. The Si-D and Si-OD bonds thus formed provide completed silicon dangling bonds that are less likely to break when exposed to electrical stresses. Therefore, the deuterium containing devices of the present invention have improved stability, quality, and reliability.

*Id.* at 4, l. 35 – 5, l. 5.

### 5.    *Ito (Ex. 1008)*

Ito is titled "Process For Producing A Semiconductor Device Having A Silicon Oxynitride Insulative Film." Ex. 1008, 1. Ito discloses that "[t]he gate insulation film should have a thickness of from approximately 30 to 3000 angstroms." *Id.* at col. 9, ll. 41-43. Ito further discloses:

> The insulative film, which is formed by a nitridation of the thermal oxidation of the silicon substrate, has such a structure that this oxidation film is gradually converted to silicon oxynitride from the surface to the interior of this film.

*Id.* at col. 8, ll. 38-42.

### 6.    *Nicollian (Ex. 1012)*

Nicollian discloses:

> The remaining problem is to maintain interface-trap and fixed-charge densities within specified limits during the life of the integrated circuit to insure stable operation. This stability is achieved by the use of coatings and encapsulants which isolate the device from its environment, and by operating the device at low temperatures so that changes in interface-trap and fixed-charge densities occur so slowly that device characteristics remain within specifications during device life.

Ex. 1012, 1121.

10

Case IPR2013-00006
Patent 6,888,204 B1

### 7.    Deal (Ex. 1009)

Deal is titled "Complementary Insulated Gate Field Effect Transistor Structure And Process For Fabricating The Structure." Ex. 1009, 1. It discloses a field effect transistor with an interface between a semiconductive silicon layer and a gate oxide layer. *Id*. at col. 9, ll. 54-56. Deal further discloses:

> The complementary field-effect transistor structure is then completed as shown in FIG. 7 by applying conductive connectors and defining them to produce metal layer 50 which interconnects p-region 36d and n-region 37s and metal layers 51 and 52 which provide electrical contact with p-region 36s and n-region 37d, respectively. Interconnection of one source/drain region of the p-channel device and one source/drain region of the n-channel device produces a complementary field-effect circuit with the switching properties described above. . . . An anneal of the structure in a hydrogen-containing ambient in the temperature range of 350°-500° C. is carried out to minimize the fast interface state density, which also adversely affects threshold voltages and other device characteristics. Finally, scratch-protection layers and packaging is provided in accordance with established practices.

*Id*. at col. 9, ll. 33-53. Deal does not disclose using deuterium for the above-described annealing.

### 8.    Gise (Ex. 1010)

Gise is titled "Semiconductor & Integrated Circuit Fabrication Techniques." Ex. 1010, 1. Gise discloses:

> Either during the alloy step or directly following it, the wafers are often exposed to a gas mixture containing hydrogen (or occasionally another gas). This step is usually called an "anneal" step. The anneal step is designed to optimize and stabilize device characteristics. Hydrogen is thought to combine with uncommitted atoms at or near the silicon-silicon

11

**Federal Circuit Appendix**
**A32**

dioxide interface, thus reducing their effect on device performance. Typical anneal temperatures are 400° – 500° C for times of 30 minutes to 60 minutes.

*Id.* at 130-31.

     9.    *Mikawa (Ex. 1005)*

Mikawa is titled "Electron Spin Resonance Study of Interface States Induced by Electron Injection in Metal-Oxide-Semiconductor Devices." Ex. 1005, 2054. Mikawa discloses:

It has often been proposed that hydrogen is involved in the electron trapping event in thermal oxides on silicon. In order to test this notion, we have subjected some sets of dry MOS oxides (described earlier) to 10% $H_2$/90% $N_2$ anneals and others to 10% $D_2$/90% $N_2$ anneals.

Ex. 1005, 2057.

C.    Claims 1, 2, 4, and 5 As Anticipated By Lisenker

Anticipation requires that "each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987). A limitation is inherently described by a prior art reference if it is necessarily present in the reference. *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

    1.    *Claim 1*

Claim 1 requires "an n-channel field effect transistor including a drain formed in a semiconductive layer, a source formed in said semiconductive layer, a channel extending between the drain and the source, a gate insulating layer over said channel, an interface between a semiconductive

12

**Federal Circuit Appendix
A33**

silicon layer and a gate insulating layer, and conductive contacts to said drain, source and on said gate insulating layer."

Lisenker expressly discloses a field effect transistor. Ex. 1004, 1, l. 16 (disclosing a "MOSFET")[13]; 11, l. 6 (disclosing "MOS transistors").[14] We credit the testimony of Dr. Reed that the Lisenker field effect transistor is of the n-channel type because "a disclosure referencing MOSFETs would be applicable to N-channel MOSFETs unless explicitly directed otherwise." Ex. 1001 ¶ 10. We also credit his testimony that "Lisenker's reference to MOSFET devices necessarily includes N-channel devices. For example, Lisenker's discussion of hot electrons (the N-type carrier) produced in the channel region indicates that the channel is N-type." *Id.* at ¶ 34 (citing Ex. 1004, col. 4, ll. 2-10). The University does not dispute that the Lisenker MOSFET is an n-channel field effect transistor.

Lisenker does not disclose expressly all of the sub-structures of the field effect transistor that are recited in claim 1. However, Micron argues that these structures are inherent to a MOSFET, based primarily on the following testimony of Dr. Reed:

> All MOSFETs have a gate insulating layer interposed between a semiconductor substrate, typically silicon, and a gate electrode. In the semiconductor layer, a channel extends between a drain and source. Electrical connections to the gate, source, and drain are made through ohmic contacts. Voltages are applied to these contacts in order to regulate the conductivity of the channel and the current flowing between the

---

[13] A MOSFET is a metal oxide semiconductor *field effect transistor*. Ex. 1002, col. 1, ll. 44-45 (emphasis added).

[14] Dr. Reed testified that "in the semiconductor industry, the term 'MOS transistor' is understood to mean MOS field effect transistor." Ex. 1001 ¶ 34.

> source and drain.    These elements set forth above are
> necessarily present in a MOSFET such that the disclosure or
> discussion of a MOSFET in a reference would include the
> disclosure of each of its attendant elements.

Ex. 1001 ¶ 9; *see also* ¶ 34.

We find this testimony persuasive in establishing that Lisenker discloses "an n-channel field effect transistor including a drain formed in a semiconductive layer, a source formed in said semiconductive layer, a channel extending between the drain and the source, a gate insulating layer over said channel, an interface between a semiconductive silicon layer and a gate insulating layer, and conductive contacts to said drain, source and on said gate insulating layer" as required by claim 1.    The University does not dispute that Lisenker discloses this limitation.

Claim 1 additionally requires the retention of deuterium at said interface so as to increase the resilience of the field effect transistor to hot electron effects during operation.    The University argues that Lisenker does not enable retention of deuterium because it allegedly teaches deuterium passivation that occurs only prior to formation of the metal contacts (or pre-metallization passivation).    PO Resp. 23-24.    However, Lisenker is not so limited.    It teaches the use of deuterium—as opposed to using hydrogen—"throughout the VLSI fabrication procedure."    Ex. 1004, 8, ll. 29-30.    And, although the University characterizes this teaching as an "isolated passage" (*see* PO Resp. 12), it is not.    Lisenker includes numerous additional teachings that undermine the University's argument that Lisenker's use of deuterium is limited to pre-metallization passivation, including the following:

14

Case IPR2013-00006
Patent 6,888,204 B1

> "In general, any hydrogen containing material used in VLSI fabrication can be replaced with corresponding deuterium containing material." Ex. 1004, 4, ll. 32-34.

> "In one aspect of the present invention, VLSI fabrication flows employ deuterium contained compounds in many or all of the fabrication steps that would normally employ hydrogen or a hydrogen containing compound." *Id.* at 5, ll. 6-9.

> "The formation of Si-D and Si-OD bonds is accomplished in the present invention by contacting a silicon wafer with deuterium or a deuterium containing compound before, during, and/or after formation a device oxide layer." *Id.* at 6, ll. 10-14.

> "A typical fabrication procedure will include various doping, etching, annealing, deposition, cleaning, passivation, and oxidation steps. In each instance in which hydrogen or a hydrogen containing compound is employed, deuterium or a deuterium containing compound can be used in its place." *Id.* at 8, ll. 30-35.

The University implies that Micron witness Dr. Reed conceded, on cross-examination, that Lisenker is limited to pre-metallization passivation. In particular, the University directs us to the following testimony:

> Q. So Lisenker is teaching that one should not anneal the deuterium until after metallization?

> MR. RIFFE: Objection, form.

> THE WITNESS: That's not the way I read this.

PO Resp. 13 (citing Ex. 2013, 88, ll. 13-17). This testimony does not support the University's argument. As is evident on its face, counsel for the University asked Dr. Reed whether Lisenker was *limited* to post-metallization passivation, and he answered in the negative. That answer is

15

**Federal Circuit Appendix**
**A36**

consistent with the disclosure of Lisenker.  *See, e.g.*, Ex. 1004, 8, ll. 29-30

("The present invention can be implemented throughout the VLSI

fabrication procedure.").

In addition to enabling retention of deuterium, Lisenker also describes

and claims it.  For example, Lisenker discloses:

> The regions where the deuterated bonds provide the greatest
> benefit in terms of device performance is at the interface of
> silicon-silicon dioxide layers.  Thus, the semiconductor devices
> of this invention will have at this interface a ratio of Si-OD plus
> Si-D bonds to Si-OH plus Si-H bonds that is substantially
> greater than ratio of naturally occurring deuterium to hydrogen.

Ex. 1004, 10, ll. 29-35; *see also id.* at 12, ll. 15-17 (Lisenker claim 3: "The

semiconductor device of claim 2 wherein the ratio of Si-OD plus Si-D bonds

to Si-OH plus Si-H bonds is greater than about 99:1.").

Claim 1 of the '204 patent requires an "increase in resilience of the

field effect transistor to hot electron effects during operation."  The

University argues that:  (1) the Decision to Institute found that this limitation

is not disclosed expressly in Lisenker; and (2) the limitation also is not

disclosed inherently in Lisenker.  PO Resp. 23.  Neither argument is

persuasive.

Contrary to the University's assertion, we did find that Lisenker

expressly discloses this limitation.  *See* Paper 15, 17 (quoting Ex. 1004, 5,

ll. 4-5 ("[D]euterium containing devices of the present invention have

improved stability, quality, and reliability.")).  Also, increased resilience to

hot electron effects is an inherent result of greater deuterium retained at the

interface.  The University does not dispute that fact, and, indeed, it is the

basis of the claims of its patent.  PO Resp. 2; *see also King Pharms., Inc. v.*

*Eon Labs, Inc.*, 616 F.3d 1267, 1276 (Fed. Cir. 2010) ("Because the '128 patent discloses no more than taking metaxalone with food, to the extent such a method increases the bioavailability of metaxalone, the identical prior art method does as well."). Lisenker teaches devices having greater amounts of deuterium retained at the interface relative to other prior art devices and, therefore, having increased resilience.

Claim 1 is anticipated by Lisenker.

2.    *Claims 2, 4, and 5*

Claims 2, 4, and 5 depend from claim 1. Claim 2 requires that the "gate insulating layer comprises silicon dioxide." Claim 4 requires that the "gate insulating layer comprises an oxide of silicon." Claim 5 requires that the "gate insulating layer comprises silicon dioxide or silicon oxy nitride."

Lisenker discloses all of these additional limitations, as it discloses the use of silicon as the semiconductive layer and silicon dioxide in the gate insulator. Ex. 1004, 4, ll. 20-27. The University does not dispute that Lisenker discloses these limitations.

Claims 2, 4, and 5 are anticipated by Lisenker.

D.    Claims 1, 2, 4-7, 9-16, and 18 As Obvious Over Lisenker

1.    *Claims 1, 2, 4, and 5*

For at least the reasons discussed above with respect to anticipation, the subject matter of claims 1, 2, 4, and 5 would have been obvious over Lisenker. Further, Dr. Reed testified that post-metallization passivation was a standard processing step in the prior art. Ex. 1001 ¶¶ 15, 35. The University does not dispute that testimony. Indeed, it previously conceded the fact during prosecution of the '204 patent. Ex. 1003, 458 ¶ 15 (declaration of Robert M. Wallace, Ph.D. citing a 1995 article and testifying

that "post metal hydrogen annealing had been in widespread use in the semiconductor industry for many years"). Dr. Reed notes Lisenker's teaching that any hydrogen-containing material used in VLSI fabrication can be replaced with corresponding deuterium-containing material, and concludes that "it would have been apparent to perform Lisenker's annealing process after the metallization steps have been performed." Ex. 1001 ¶¶ 35, 36.

In opposition, the University asserts that one of ordinary skill would have ignored the teachings of Lisenker. PO Resp. 9-11, 14. In particular, it argues that the fundamental theory underlying Lisenker's teachings is that "the Si-D bond is significantly stronger than the Si-H bond." *Id.* at 9 (providing no citation to Lisenker).[15] But, according to the University, Lisenker erroneously relies on energy values for bonds <u>not</u> at the interface. *Id.* at 10. The University further argues that a person of ordinary skill in the art at the time of the invention would have known that "the energies for Si-D and Si-H bond disassociation *at the silicon surface* are identical or substantially identical." *Id.* (emphasis added). Therefore, the University reasons, such a person "would have concluded that the teachings of Lisenker were immaterial to the problem facing the inventors of the '204 patent, *i.e.*, how to solve for hot carrier effects involving bonds at the silicon substrate." *Id.* (citing *In re Young*, 927 F.2d 588 (Fed. Cir. 1991)).

Contrary to the implication of the University's argument, however, the scope of the prior art is not limited to solutions that are directed to the

---

[15] Lisenker states that "[t]he stability of oxide layers is improved in the present invention because the bond energy of the Si-H and Si-OH bonds is increased by replacing the hydrogen atoms with deuterium atoms." Ex. 1004, 4, l. 35 – 5, l. 1.

Case IPR2013-00006
Patent 6,888,204 B1

problem the patentees set out to solve. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007) ("In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under § 103."). Additionally, we disagree with the further implication that Lisenker is not concerned with solving for hot carrier effects involving bonds at the silicon surface (or silicon-silicon dioxide interface). *See* Ex. 1004, 4, ll. 2-12 (discussion by Lisenker of problems caused by hot electrons at the silicon-silicon dioxide interface); Fig. 1 (illustrating an improved silicon-silicon dioxide interface in accordance with the Lisenker invention).

Also, the University's reliance on *In re Young* is not persuasive. *Young* does not support the proposition that a prior art reference may be ignored. *Young*, 927 F.2d at 591 ("Even if tending to discredit [the] Carlisle [patent], [the] Knudsen [article] cannot remove Carlisle from the prior art. Patents are part of the literature of the art and are relevant for all they contain."). In *Young*, the court held that, "[w]hen prior art contains apparently conflicting references, the Board must weigh each reference for its power to suggest solutions to an artisan of ordinary skill." *Id*. Here, the University has presented evidence conflicting, allegedly, with Lisenker's underlying theory of operation. But, the University has not provided a reference conflicting with Lisenker's express teaching that "deuterium containing devices of the present invention have improved stability, quality, and reliability." Ex. 1004, 5, ll. 4-5. Accordingly, we are not persuaded that a person of ordinary skill in the art would have ignored Lisenker.

19

**Federal Circuit Appendix**
**A40**

Case IPR2013-00006
Patent 6,888,204 B1

    2.    *Claims 6, 10, 13, 14, and 15*

Each of independent claims 6, 10, 13, 14, and 15 is similar to claim 1 and additionally requires a gate insulating/dielectric layer/film "having a thickness not exceeding about 55 Angstroms." We find that Lisenker, as discussed above and below, teaches the subject matter of these claims except for the thickness limitation.

The Supreme Court has held that the obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418. In that regard, we credit the testimony of Micron's witness, Dr. Reed, that, at the time of filing the '204 patent, it would have been apparent to one of ordinary skill in the art to reduce the thickness of the gate insulating film of Lisenker to about 55 Angstroms or less, consistent with the general, decades-long trend of device miniaturization in the semiconductor industry. Ex. 1001 ¶ 38.

We also credit Dr. Reed's testimony that, at the time of filing the '204 patent, others already had made gate insulating films having thicknesses of about 55 Angstroms or less. *Id.* at ¶¶ 39, 43. The combination of familiar elements according to known methods to achieve predictable results, such as reducing the thickness of the gate insulating film of Lisenker to 55 Angstroms or less, is likely to be obvious. *See KSR*, 550 U.S. at 416.

We further note that the University does not argue, or direct us to evidence, to show criticality of the thickness limitation, such that we might conclude that obviousness has not been shown. S*ee generally* PO Resp.; *see*

20

**Federal Circuit Appendix**
**A41**

Case IPR2013-00006
Patent 6,888,204 B1

Prelim. Resp. 2.  Rather, the University's prior art-based arguments are directed exclusively to Lisenker.

>    3.    *Claims 7, 11, 12, and 16*

Claim 7 is dependent on claim 6 and additionally requires that the "gate insulating layer comprises silicon dioxide."  Claim 11 is dependent on claim 10 and additionally requires that the "the semiconductive layer comprises silicon, and the gate dielectric film includes a silicon compound." Claim 12 is dependent on claim 11 and additionally requires that the "silicon compound comprises an oxygen or a nitrogen containing silicon compound." Claim 16 is dependent on claim 15 and additionally requires that the "gate insulator comprises an oxide of silicon."

Lisenker discloses all of these additional limitations, as it discloses the use of silicon as the semiconductive layer and silicon dioxide in the gate insulator.  Ex. 1004, 4, ll. 20-27.  The University does not dispute that Lisenker teaches these limitations.

>    4.    *Claim 9*

Claim 9 is dependent on claim 6 and additionally recites "deuterium atoms from said post-fabrication passivation covalently bonded at said interface."  We have construed this product-by-process limitation to require deuterium atoms covalently bonded at the interface, but not as a result of any particular process.  Lisenker discloses deuterium atoms in covalent bonds at the interface.  Ex. 1004, 5, ll. 15-24 ("Devices of this invention will preferably have substantial numbers of Si-H and/or Si-OH bonds replaced with Si-D and/or Si-OD bonds."); *see also id.* at Fig. 1 (illustrating deuterium atoms in covalent bonds at a silicon-silicon dioxide interface). The University does not dispute that Lisenker teaches this limitation.

21

####### 5.    *Claim 18*

Claim 18 is dependent on claim 15 and additionally requires that the "the field effect transistor comprises an n-channel device subject in operation to hot electron stress." As set forth above in the anticipation analysis, based on Dr. Reed's testimony, we find that Lisenker teaches the limitation of an n-channel field effect transistor. Ex. 1001 ¶¶ 10, 34 (citing Ex. 1004, 4, ll. 2-10). The University does not dispute that Lisenker teaches this limitation.

Micron has made a prima facie showing that the subject matter of claims 1, 2, 4-7, 9-16, and 18 would have been obvious over Lisenker.

E.    Claims 1, 2, 4-7, 9-16, and 18 As Obvious Over Lisenker and Gise

For this ground, Micron additionally relies on Gise as allegedly teaching a post-metal annealing (in hydrogen) for about an hour. Gise does teach this. Ex. 1010, 130-31. Further, we credit the testimony of Dr. Reed that "it would have been apparent to perform Lisenker's annealing process after the metallization steps have been performed" in light of Gise's teaching. Ex. 1001 ¶ 36.

In opposing prima facie obviousness on this ground, the University merely relies on its prior and unpersuasive arguments regarding Lisenker. PO Resp. 17. Micron has made a prima facie showing that the subject matter of claims 1, 2, 4-7, 9-16, and 18 would have been obvious over Lisenker and Gise.

F.    Claim 3 As Obvious Over Lisenker, Gise, and Nicollian

Claim 3 is dependent on claim 1 and additionally requires that the semiconductor device "is encapsulated." Nicollian discloses "the use of coatings and encapsulants" to isolate a semiconductor device from its

22

**Federal Circuit Appendix
A43**

environment to promote stable operation of it. Ex. 1012, 1121. We credit the testimony of Dr. Reed that encapsulation "has long been incorporated into integrated circuit manufacturing" and that "[a]t the time of the priority date of the '204 patent, it would have been apparent to include an encapsulation step as taught by Nicollian in the device of Lisenker in order to prevent physical damage and corrosion to the semiconductor device." Ex. 1001 ¶¶ 45-46.

In opposing prima facie obviousness on this ground, the University concedes Nicollian teaches the additional limitation recited in claim 3. PO Resp. 17. It opposes this ground only on its prior and unpersuasive arguments regarding Lisenker. *Id.* Micron has made a prima facie showing that the subject matter of claim 3 would have been obvious over Lisenker, Gise, and Nicollian.

G.     Claims 6-18 As Obvious Over Lisenker, Gise, and Ito

Micron relies on Ito for teaching two things: (1) a gate insulator having a thickness not exceeding about 55 Angstroms (as required by all of claims 6-18); and (2) a gate insulator comprising silicon oxynitride (as required by claims 8 and 17).

We already have determined above that the subject matter of claims 6, 7, 9-16, and 18 would have been obvious over Lisenker alone as well as over Lisenker in view of Gise. In doing so, however, we did not find an express teaching within Lisenker or Gise of the thickness limitation of about 55 Angstroms or less. Ito provides such an express teaching. *See* Ex. 1008, col. 9, ll. 41-43 (teaching gate insulative layers as thin as approximately 30 Angstroms). Ito also teaches gate insulative layers that comprise silicon oxynitride, as required by claims 8 and 17. *Id.* at col. 8, ll. 38-42.

23

**Federal Circuit Appendix
A44**

Case: 14-1510    Document: 16    Page: 45    Filed: 07/29/2014

Case IPR2013-00006
Patent 6,888,204 B1

We credit the testimony of Dr. Reed that, at the time of the priority date of the '204 patent, it would have been apparent to substitute Ito's thin insulating layer comprising oxynitride for the silicon dioxide layer disclosed by Lisenker because miniaturization of semiconductor elements was a common endeavor among those in the semiconductor industry and because silicon oxynitride was known to improve the resilience of MOSFETs to hot carrier effects. Ex. 1001 ¶ 44.

In opposing prima facie obviousness on this ground, the University merely relies on its prior and unpersuasive arguments regarding Lisenker. PO Resp. 17-18. Micron has made a prima facie showing that the subject matter of claims 6-18 would have been obvious over Lisenker, Gise, and Ito.

H.    Claim 10 As Obvious Over Lisenker, Gise, Ito, and Mikawa

Claim 10 recites a passivation "atmosphere comprising about 10% deuterium and about 90% nitrogen." As noted in the Decision to Institute, Mikawa discloses passivation atmospheres of both "10% $H_2$/90% $N_2$" and "10% $D_2$/90% $N_2$." Dec. 9. In its petition, and perhaps unintentionally, Micron relies on Mikawa for teaching a passivation atmosphere comprising "about 10% *hydrogen* and about 90% nitrogen." Pet. 59 (emphasis added). The University argues that the Decision to Institute "cites to ***no*** evidence that one of skill in the art would have been motivated to substitute the hydrogen taught in Mikawa with the deuterium specified in claim 10." PO Resp. 18. That is not true. Lisenker provides such evidence, and it was pointed out in the Decision. *See, e.g.*, Dec. 6 (quoting Ex. 1004, 4, ll. 32-34 ("In general, any hydrogen containing material used in VLSI fabrication can be replaced with corresponding deuterium containing material.")).

24

**Federal Circuit Appendix
A45**

Micron has made a prima facie showing that the subject matter of claim 10 would have been obvious over Lisenker, Gise, Ito, and Mikawa.

I.     Claims 1-5 As Obvious Over Deal and Lisenker

Micron asserts that Deal teaches the subject matter of these claims except for the retention of deuterium at the interface. Pet. 28-29. We agree and note that the University does not dispute the asserted teachings of Deal. PO Resp. 18-19.

Micron next asserts that it would have been obvious for a person of ordinary skill in the art at the time of the invention of the '204 patent to modify Deal to employ deuterium instead of hydrogen as taught by Lisenker to increase the resiliency of the field effect transistor to hot electron effects. Pet. 28-29. Dr. Reed testified:

> At the time of the priority date of the '204 patent, the benefits of substituting deuterium for hydrogen were known. As I have discussed previously, Lisenker teaches the substitution of deuterium for hydrogen and states that such a substitution results in "bonds that are less likely to break when exposed to electrical stresses," which improves device "stability, quality, and reliability." It would have been apparent to incorporate the teachings of Lisenker with the '380 patent [i.e., Deal] because both references are directed to improving the quality of the $Si/SiO_2$ interface, which has a direct impact on the device quality. Lisenker suggests that "any hydrogen containing material used in VLSI fabrication can be replaced with corresponding deuterium containing material," which would include the '380 patent's post-metallization anneal.

Ex. 1001 ¶ 49 (footnotes omitted).

In opposing prima facie obviousness on this ground, the University merely relies on its prior arguments regarding Lisenker. PO Resp. 18-19. However, the argument that Lisenker is limited to pre-metal annealing and,

25

Case IPR2013-00006
Patent 6,888,204 B1

thus, results in no increase in deuterium at the interface is misplaced here (in addition to being erroneous). It is Deal, and not Lisenker, that is relied on for its teaching of post-metal annealing. That teaching is undisputed. And, as Dr. Reed testified, Lisenker suggests to the person of ordinary skill in the art to modify Deal's post-metal anneal by substituting deuterium for hydrogen.

Micron has made a prima facie showing that the subject matter of claims 1-5 would have been obvious over Deal in view of Lisenker.

J.    Claims 6-18 As Obvious Over Deal, Lisenker, and Ito

Here, Micron again relies on Ito for teaching a gate insulator having a thickness not exceeding about 55 Angstroms (as required by claims 6-18), which gate insulator comprises silicon oxynitride (as required by claims 8 and 17).

As set forth above, we credit the testimony of Dr. Reed that, at the time of the priority date of the '204 patent, it would have been apparent to substitute Ito's thin insulating layer comprising oxynitride for the silicon dioxide layer disclosed by Lisenker because miniaturization of semiconductor elements was a common endeavor among those in the semiconductor industry and/or silicon oxynitride was known to improve the resilience of MOSFETs to hot carrier effects. Ex. 1001 ¶ 44.

In opposing prima facie obviousness on this ground, the University again relies exclusively on its prior arguments regarding Lisenker. PO Resp. 19. But, it is Deal, and not Lisenker, that is relied on for its teaching of post-metal annealing. That teaching is undisputed. And, as Dr. Reed testified, Lisenker suggests to the person of ordinary skill in the art to modify Deal's post-metal anneal by substituting deuterium for hydrogen.

26

Case IPR2013-00006
Patent 6,888,204 B1

Micron has made a prima facie showing that the subject matter of claims 6-18 would have been obvious over Deal, Lisenker, and Ito.

K.    Objective Indicia

The University argues that certain objective indicia, or secondary considerations, demonstrate non-obviousness of the claims.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.  As indicia of obviousness or nonobviousness, these inquiries may have relevancy.").  In particular, the University argues that the claimed invention of the '204 patent yielded unexpected results and that others failed to eliminate hot carrier effects.  PO Resp. 4-8.

The University's evidence of unexpected results is not persuasive because it does not compare the results of the claimed invention of the '204 patent to the closest prior art, which is Lisenker.  *See* PO Resp. 4-7; *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991) ("[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art.").  Lisenker expressly discloses that "deuterium containing devices of the present invention have improved stability, quality, and reliability" relative to those containing hydrogen.   Ex. 1004, 5, ll. 4-5.  Thus, when properly considering Lisenker, the beneficial results of substituting deuterium for hydrogen are expected.  *See In re Skoner*, 517 F.2d 947, 950 (CCPA 1975) ("Expected beneficial results are evidence of obviousness of a claimed invention.  Just as unexpected beneficial results are evidence of unobviousness.").

27

**Federal Circuit Appendix**
**A48**

Case IPR2013-00006
Patent 6,888,204 B1

With respect to the alleged failure of others, the University argues that the "continued use [in the prior art] of hydrogen passivation reflects a systemic failure in the art to solve the problem faced by the inventors of the '204 patent." PO Resp. 8. Thus, the University again fails to account for the prior art teachings of Lisenker, which already had proposed the substitution of deuterium for hydrogen during passivation, and indeed, throughout the VLSI fabrication process.

Having considered all of the evidence, including Patent Owner's secondary considerations evidence, we conclude that the claims would have been obvious.

CONCLUSION

Petitioner, Micron, has demonstrated by a preponderance of the evidence that claims 1-18 of the '204 patent are unpatentable as follows:

claims 1, 2, 4, and 5 are anticipated by Lisenker;

claims 1, 2, 4-7, 9-16, and 18 would have been obvious over Lisenker;

claims 1, 2, 4-7, 9-16, and 18 would have been obvious over Lisenker and Gise;

claim 3 would have been obvious over Lisenker, Gise, and Nicollian;

claims 6-18 would have been obvious over Lisenker, Gise, and Ito;

claim 10 would have been obvious over Lisenker, Gise, Ito, and Mikawa.

claims 1-5 would have been obvious over Deal and Lisenker; and

claims 6-18 would have been obvious over Deal, Lisenker, and Ito.

28

**Federal Circuit Appendix**
**A49**

Case IPR2013-00006
Patent 6,888,204 B1

ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1-18 of the '204 patent are CANCELLED.

Case IPR2013-00006
Patent 6,888,204 B1


PETITIONER:

    Ruffin Cordell
    Timothy Riffe
    FISH & RICHARDSON P.C.
    cordell@fr.com
    riffe@fr.com

PATENT OWNER:

    Dennis Gross
    THE HILL FIRM
    dagross@hillfirm.com

    George Summerfield
    STADHEIM AND GREAR
    summerfield@stadheimgrear.com

**Federal Circuit Appendix**
**A51**

US006888204B1

(12) **United States Patent**
Lyding et al.

(10) Patent No.: **US 6,888,204 B1**
(45) Date of Patent: **May 3, 2005**

(54) **SEMICONDUCTOR DEVICES, AND METHODS FOR SAME**

(75) Inventors: **Joseph W. Lyding**, Champaign, IL (US); **Karl Hess**, Champaign, IL (US)

(73) Assignee: **The Board of Trustees of the University of Illinois**, Urbana, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/160,657**

(22) Filed: **Sep. 25, 1998**

**Related U.S. Application Data**

(63) Continuation of application No. 09/020,565, filed on Jan. 16, 1998, now Pat. No. 6,147,014, which is a continuation of application No. PCT/US97/00629, filed on Jan. 16, 1997, now abandoned, which is a continuation-in-part of application No. 08/586,411, filed on Jan. 16, 1996, now Pat. No. 5,872,387.

(51) Int. Cl.[7] ....................... $H01L\ 29/76$; I01L 31/113

(52) U.S. Cl. ...................... **257/405**; 257/651; 257/632; 257/607; 257/327

(58) Field of Search ................................. 257/629, 631, 257/607, 617, FOR 629, FOR 631, 327, 405, 410, 632, 651; 438/38

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,849,204 A | 11/1974 | Fowler | 148/1.5 |
| 3,923,559 A | 12/1975 | Sinha | 148/1.5 |
| 4,027,380 A * | 6/1977 | Deal et al. | 29/571 |
| 4,113,514 A | 9/1978 | Pankove et al. | 148/1.5 |
| 4,151,007 A * | 4/1979 | Levinstein et al. | 438/657 |
| 4,212,100 A * | 7/1980 | Paivinen et al. | 438/278 |
| 4,239,554 A * | 12/1980 | Yamazaki | 136/255 |
| 4,290,825 A | 9/1981 | Dearnaley et al. | 148/33.4 |
| 4,331,486 A | 5/1982 | Chenevas-Paule et al. | 148/1.5 |
| 4,352,835 A * | 10/1982 | Holbrook et al. | 427/552 |
| 4,435,896 A * | 3/1984 | Parrillo et al. | 438/217 |

| | | | |
|---|---|---|---|
| 4,542,512 A * | 9/1985 | Van Den Beemt | 372/46 |
| 4,620,211 A | 10/1986 | Baliga et al. | 357/38 |
| 4,796,081 A * | 1/1989 | Cheung et al. | 257/751 |
| 4,936,781 A * | 6/1990 | Mircea et al. | 438/328 |
| 4,962,065 A * | 10/1990 | Brown et al. | 438/792 |
| 4,992,840 A * | 2/1991 | Haddad et al. | 257/29 |
| 5,059,551 A | 10/1991 | Chevallier et al. | 437/96 |
| 5,162,892 A * | 11/1992 | Hayashi et al. | 257/65 |
| 5,179,029 A | 1/1993 | Gottscho et al. | 437/10 |
| 5,198,880 A * | 3/1993 | Taguchi et al. | 257/214 |
| 5,248,348 A | 9/1993 | Miyachi et al. | 136/258 |
| 5,250,446 A | 10/1993 | Osawa et al. | 437/24 |
| 5,254,506 A * | 10/1993 | Hori | 438/769 |
| 5,264,724 A | 11/1993 | Brown et al. | 257/347 |
| 5,320,975 A * | 6/1994 | Cederbaum et al. | 438/153 |
| 5,434,440 A * | 7/1995 | Yoshitomi et al. | 257/344 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 94/19829 | 9/1994 | H01L/29/40 |

OTHER PUBLICATIONS

Okazaki et al., "Characteristics of Sub–¼–$\mu$m Gate Surface Channel PMOSFET's Using a Multilayer Gate Structure of Boron–Doped Poly–Si on Thin Nitrogen–Doped Poly–Si," IEEE Transactions of Electron Devices, vol. 41, No. 12, Dec. 1994, pp. 2369–2375.*

C.T. Sah, Models and Experiments on Degredation of Oxidized Silicon, 1990, Soild–State Electronics, vol. 33, No. 2, pp. 147–167.*

(Continued)

*Primary Examiner*—Amir Zarabian
*Assistant Examiner*—Pamela E Perkins

(57) **ABSTRACT**

Described are preferred processes for conditioning semiconductor devices with deuterium to improve operating characteristics and decrease depassivation which occurs during the course of device operation. Also described are semiconductor devices which can be prepared by such processes.

**18 Claims, 3 Drawing Sheets**



**US 6,888,204 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,514,628 A | * | 5/1996 | Enomoto et al. | 438/6 |
| 5,571,339 A | | 11/1996 | Ringel et al. | 136/252 |
| 5,693,961 A | | 12/1997 | Hamada | 257/66 |
| 5,711,998 A | * | 1/1998 | Shufflebotham | 427/535 |
| 5,744,202 A | * | 4/1998 | Nickel | 427/527 |
| 5,822,175 A | * | 10/1998 | Azuma | 361/321.5 |
| 5,830,575 A | * | 11/1998 | Warren et al. | 257/629 |
| 5,864,161 A | * | 1/1999 | Mitani et al. | 257/347 |
| 5,872,387 A | | 2/1999 | Lyding et al. | 257/607 |
| 6,023,093 A | * | 2/2000 | Gregor et al. | 257/632 |
| 6,147,014 A | * | 11/2000 | Lyding et al. | 438/798 |
| 6,328,801 B1 | * | 12/2001 | Gary et al. | 118/688 |

### OTHER PUBLICATIONS

A. Uchiyama, H. Fukuda, T. Hayashi, T. Iwabuchi, S. Ohno "High Performance Dual–gate Sub–halfmicron CMOS-FET's with 6nm–thick Nitrided SiO2 Films in an N2O Ambient", *IEDM Tech. Dig. 1990*, pp. 16.6.1–16.6.4.

"Process Stability of Deuterium–Annealed MOSFET's," W.F. Clark, et al., IEEE Electron Device Letters, vol. 20. No. 1, Jan. 1999, pp. 48–50.

"Defect Generation in Field–Effect Transistors Under Channel–Hot–Electron Stress," D.J. DiMaria, Journal of Applied Physics, vol. 87, No. 12, Jun. 15, 2000, pp. 8707–8715.

Ph. Avouris, R.E. Walkup, A.R. Rossi, T.–C. Shen, G.C. Abeln, J.R. Tucker and J.W. Lyding, "STM–Induced H Atom Desorption From Si(100): Isotope Effects And Site Selectivity", *Chemical Physics Letters*, vol. 257, pp. 148–154 (Jul. 19, 1996).

G. Ganguly and A. Matsuda, "Light–Induced Defect Densities In Hydrogenated And Deuterated Amorphous Silicon Deposited At Different Substrate Temperatures", *Am. Phys. Soc.*, vol. 49, No. 16, pp. 10 986–10 990 (Apr. 15, 1994).

I.P. Ipatova, O.P. Chikalova–Luzina and K. Hess, "Effect Of Localized Vibrations On The Si Surface Concentrations Of H And D", *J. Appl. Phys.*, vol. 83, No. 2, pp. 814–819 (Jan. 15, 1998).

J.W. Lyding, T.–C. Shen, G.C. Abeln, C. Wang, E.T. Foley and J.R. Tucker, "Silicon Nanofabrication And Chemical Modification By UHV–STM", *Mat. Res. Soc. Symp. Proc.*, vol. 380, pp. 187–197 (1995).

J.C. Mikkelsen, Jr., "Secondary Ion Mass Spectrometry Characterization Of $D_2O$ and $H_2{}^{18}O$ Stream Oxidation Of Silicon", *J. Electronic Mat.*, vol. 11, No. 3, pp. 541–558 (1982).

S.M. Myers and P.M. Richards, "Interactions Of Deuterium With Ion–Irradiated $SiO_2$ On Si", *J. Appl. Phys.*, vol. 67, No. 9, pp. 4064–4071 (May 1, 1990).

H. Park and C.R. Helms, "The Effect Of Annealing Treatment On The Distribution Of Deuterium In Silicon And In Silicon/Silicon Oxide Systems", *J. Electrochem. Soc.*, vol. 139, No. 7, pp. 2042–2046 (Jul. 1992).

N.S. Saks and R.W. Rendell, "The Time–Dependence Of Post–Irradiation Interface Trap Build–Up In Deuterium–Annealed Oxides", *IEEE Transactions On Nuclear Science*, vol. 39, No. 6, pp. 2220–2229 (Dec. 1992).

N.S. Saks and R.W. Rendell, "Time–Depenence Of The Interface Trap Build–Up In Deuterium–Annealed Oxides After irradiation", *Appl. Phys. Lett.*, vol. 61, No. 25, pp. 3014–3016 (Dec. 21, 1992).

T.–C. Shen, C. Wang, G.C. Abeln, J.R. Tucker, J.W. Lyding, Ph. Avouris and R.E. Walkup, "Atomic–Scale Desorption Through Electronic And Vibrational Excitation Mechanisms", *Science*, vol. 268, pp. 1590–1592 (Jun. 16, 1995).

J.M. Zavada, B.L. Weiss, I.V. Bradley, B. Theys, J. Chevallier, R. Rahbi, R. Addinall, R.C. Newmann and H.A. Jenkinson, "Optical Waveguides Formed By Deuterium Passivation Of Acceptors In Si Doped p–Type GaAs Epilayers", *J. Appl. Phys.*, vol. 71, No. 9, pp. 4151–4155 (May 1, 1992).

* cited by examiner



**Fig. 1**



**Fig. 2**



**Fig. 3**

US 6,888,204 B1

| 1 | 2 |

# SEMICONDUCTOR DEVICES, AND METHODS FOR SAME

## REFERENCE TO RELATED APPLICATIONS

This is a continuation of U.S. patent application Ser. No. 09/020,565 filed Jan. 16, 1998, now issued as U.S. Pat. No. 6,147,014, which is a continuation of international application No. PCT/US97/00629 filed Jan. 16, 1997 which designated the United States, now abandoned, which is a continuation-in-part of U.S. patent application Ser. No. 08/586,411 filed Jan. 16, 1996, now issued as U.S. Pat. No. 5,872,387.

## GOVERNMENT RIGHTS

This invention was made with government support under Grant No. N00014-92-J-1519 awarded by the Department of Navy Research. The government has certain rights in the invention.

## BACKGROUND OF THE INVENTION

The present invention resides in the field of semiconductor devices, and in particular relates to methods for treating semiconductor devices or components thereof in order to reduce the degradation of semiconductor device characteristics over time.

As further background, hydrogen passivation has become a well-known and established practice in the fabrication of semiconductor devices. In the hydrogen passivation process, defects which affect the operation of semiconductor devices are removed. For example, such defects have been described as recombination/generation centers on active components of semiconductor devices. These centers are thought to be caused by dangling bonds which introduce states in the energy gap which remove charged carriers or add unwanted charge carriers in the device, depending in part on the applied bias. While dangling bonds occur primarily at surfaces or interfaces in the device, they also are thought to occur at vacancies, micropores, dislocations, and also to be associated with impurities.

Over the years a number of hydrogen passivation processes have been proposed. For example, U.S. Pat. No. 3,923,559 describes a process in which, in the fabrication of a device such as a metal oxide semiconductor field effect transistor (MOSFET) device, hydrogen gas is introduced into the layer of silicon dioxide prior to deposition of the metal electrodes. Thereafter, the metal electrodes are deposited, thereby trapping the hydrogen gas within the device. Thereafter, the device is annealed at an elevated temperature and the hydrogen previously introduced migrates to the silicon surface to neutralize undesirable interface states produced during device fabrication.

U.S. Pat. No. 4,151,007 describes a passivation process in which the last fabrication step in the device fabrication involves heating the device in an ambient of hydrogen gas at a temperature of 650° C. to 950° C. This final hydrogen anneal step reportedly negated the effects of slow trapping and thus improved the stability of the MOS structures.

U.S. Pat. No. 4,113,514 describes a passivation process which involves exposing the device to atomic hydrogen, for example generated using a glow-discharge apparatus acting upon molecular hydrogen, at a temperature lower than 450° C. Somewhat similarly, U.S. Pat. No. 4,331,486 describes a passivation process in which a hydrogen plasma is created to treat the semiconductor devices with atomic hydrogen.

U.S. Pat. No. 3,849,204 describes a passivation process which involves implanting hydrogen ions in the area of defects, and thereafter annealing the substrate in an inert atmosphere to eliminate the interface states.

Another problem which has arisen in the semiconductor industry is the degradation of device performance by hot carrier effects. This is particularly of concern with respect to smaller devices in which proportionally larger voltages are used. When such high voltages are used, channel carriers can be sufficiently energetic to enter an insulating layer and degrade device behavior. For example, in silicon based P-channel MOSFETs, channel strength can be reduced by trapped energetic holes in the oxide which lead to a positive oxide charge near the drain. On the other hand, in N-channel MOSFETs, gate-2-drain shorts may be caused by electrons entering the oxide and creating interface traps and oxide wear-out. "Drain engineering" has been an emerging field attempting to cope with these problems, for example involving the use of a lightly-doped drain (LDD) in which a lightly-doped extension of the drain is created between the channel and the drain proper. For additional detail as to these and other potential measures for reducing susceptibility to hot carrier effects, reference can be made for example to U.S. Pat. Nos. 5,352,914, 5,229,311, 5,177,571, 5,098,866, 4,859,620, 4,691,433 and 4,521,698. Such solutions are, however, expensive because they typically complicate the fabrication process. Their avoidance, or at least their simplification, would be desirable.

In light of this background there exists a need for improved passivation processes and devices resulting from such processes. The present invention addresses these needs.

## SUMMARY OF THE INVENTION

It has been discovered that semiconductor devices, for example including MOS devices, can be advantageously treated with deuterium to improve their operational characteristics. Accordingly, one preferred embodiment of the present invention provides a method for treating a semiconductor device which includes a step of passivating the device with deuterium. Semiconductor devices so passivated also form a part of the present invention.

In a more preferred aspect, the invention provides a semiconductor device which includes a semiconductor layer including a Group III, IV or V element, or a mixture thereof. The device also includes an insulative (dielectric) layer atop the semiconductor layer, wherein deuterium atoms are covalently bound to atoms of the Group III, IV or V element in amounts sufficient to significantly increase resilience of the device to hot carrier effects.

Additional embodiments of the invention provide processes in which deuterium-treated semiconductor devices of the invention are operated under conditions which produce hot carrier effects, and in which deuterium is introduced into the semiconductor device after fabrication is complete, and/or in one or more of a variety of fabrication steps, and the introduced deuterium is used to improve the operative characteristics of the device.

Methods and devices of the invention provide unique advantages in the field of semiconductors, their preparation and their use. For example, the provided device demonstrate improved operational characteristics and resist aging or "depassivation" due to hot-carrier effects. Moreover, devices of the invention can be operated using higher voltages to increase performance, while better resisting degradation due to hot-carrier effects. Likewise, methods of the invention are beneficial for preparing radiation hard devices, which are usually operated at higher voltages. Further, methods of the invention can be readily and economically practiced and

US 6,888,204 B1

3

incorporated into existing fabrication techniques, and may eliminate the need for costly and/or complicated measures otherwise taken to guard against hot electron effects, for example lightly doped drain (LDD) technology, or provide more processing flexibility in the conduct of such measure.

Additional objects, features and advantages of the invention will be apparent from the following description.

BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a diagram of one illustrative metal oxide semiconductor field effect transistor to which the present invention can be applied.

FIG. 2 is a graph illustrating the comparative time-dependent degradation of the transconductance for five NMOS transistors sintered in hydrogen (solid symbols) and deuterium (open symbols), as discussed in the Experimental.

FIG. 3 is a graph illustrating the comparative time-dependent increase of the threshold voltage for NMOS transistors sintered in hydrogen (solid symbols) and deuterium (open symbols), as discussed in the Experimental.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

For the purposes of promoting an understanding of the principles of the invention, reference will now be made to embodiments thereof and specific language will be used to describe the same. It will nevertheless be understood that no limitation of the scope of the invention is thereby intended, such alterations, further modifications and applications of the principles of the invention as described herein being contemplated as would normally occur to one skilled in the art to which the invention pertains.

As disclosed above, preferred embodiments of the present invention involve the use of deuterium in the fabrication of semiconductor devices and components thereof. It has been discovered that semiconductor devices can be advantageously treated with deuterium to dramatically improve their operational characteristics. For example, treatment with deuterium provides a reduction in the depassivation or "aging" of semiconductor devices due to hot-carrier effects. Such aging is evidenced, for example, by substantial degradations of threshold voltage, transconductance, or other device characteristics. In accordance with the present invention, semiconductor devices are fabricated using deuterium to condition the devices and stably reduce the extent of these degradations. This can be accomplished, for instance, by disposing molecular ($D_2$), atomic ($^\circ D$) or ionic ($D^+$) deuterium in the areas of the device in which protection against hot carrier effects is desired, and causing the deuterium to covalently bond with atoms in the area so as to be stably incorporated, for example bonding to atoms of a semiconductor layer. This covalent bonding can conveniently be achieved by heating. In these regards, the particular modes by which the deuterium is provided to the desired area, e.g. by diffusion of molecular (gaseous) deuterium or implantation of atomic or ionic deuterium, and is caused to be covalently bonded in the desired area, are not critical to the broad aspects of the present invention.

Similarly, the present invention is applicable to a broad range of semiconductor devices and their fabrication processes. Generally speaking the semiconductor devices will include at least one active component therein, for example a diode, transistor, thyristor or the like. Illustrative examples include MOS-based devices such as MOSFET devices, including CMOS and nMOS technology, light-emitting

4

diodes, laser diodes, and the like. In this regard, the MOS-based technology discussed herein is intended to encompass the use of gate conductors other than metals as is commonly practiced, and thus reference to MOS-based devices encompasses other insulated gate technologies (e.g. IGFETs). While aspects of the present invention will now be described in more detail with reference to MOSFETs (i.e. IGFETs), it will be understood that the invention is applicable to the above-mentioned and other semiconductor devices which are susceptible to aging due to hot-carrier effects and generally the effects of energetic charge carriers.

Referring now to FIG. 1, shown is a diagram of an illustrative MOSFET to which the present invention can be applied. The device 11 includes a semiconductive substrate 12, for example comprising one or more members selected from Group III, IV or V of the periodic table. The semiconductive substrate can be a p- or n-type substrate and can, for instance, be doped or undoped crystalline silicon or amorphous silicon, gallium arsenide, or gallium aluminum arsenide. The device 11 also includes a drain 13 (n- or p-type, depending on the type of substrate) and a source 14 (similarly n- or p-type) formed in the substrate 12, and a channel 15 extending therebetween. A field oxide or other electrically insulative (dielectric) layer 16 is also provided, as is a gate insulator (dielectric) 17. Insulators 16 and 17 can be formed of a single layer or of multiple layers, and can include for instance an oxide and/or nitride of silicon, e.g. a silicon dioxide, silicon nitride, silicon oxy nitride, or silicon-rich oxide film. Device 11 also includes conductive contacts 18, 19 and 20 for the drain 13, source 14 and gate insulator 17, which can include one or more conductive materials such as metals, e.g. aluminum, gold, or copper; metal silicides such as tungsten, molybdenum, tantalum or titanium silicide, or combinations thereof; polysilicon; and titanium nitride. These and other electrically conductive materials are known in the art and can be used in the present invention. The illustrated device is typical of a MOSFET employing a polysilicon gate contact, and includes an insulator 21 over the gate contact 20. The general fabrication techniques for semiconductor devices of the invention can be conventional, including conventional growth or deposition of various layers and doping operations employing appropriate masks, encapsulation, packaging and other steps.

In accordance with the invention, the semiconductor device will be treated with deuterium during or after completion of fabrication so as to condition the device to improve its operating characteristics. In the case of MOSFET devices, such improvement is thought to occur due to the elimination of interface states between the semiconductor substrate 12 (e.g. silicon) and the gate insulator 17 (e.g. silicon dioxide) by covalent bonding of deuterium atoms at the interface. Therefore, in preferred aspects of the present invention, deuterium, either in atomic, ionic or molecular form, is disposed at the interface of the substrate 12 and the gate insulator 17, and caused to covalently bond to atoms at the interface, for instance atoms at the surface of the semiconductor layer.

In this regard, deuterium conditioning or passivation of the device 12 can be achieved in a variety of ways. For instance, device 11 can be heated in the presence of a flowing, mixed or static deuterium-enriched ambient at one or more stages of fabrication, and/or after fabrication is completed (i.e. after the metal contacts are completed). The deuterium-enriched ambient in accordance with the inven-

US 6,888,204 B1

5

tion will contain deuterium at a level above that which occurs in nature, and above that which occurs as a low-level impurity in other supplied gases (for example purified hydrogen gas which is presently used in hydrogen passivation processes for semiconductors). Generally speaking, ambients containing 0.1% up to 100% by volume deuterium gas will be employed. The deuterium-enriched ambient will preferably be completely or essentially free of oxygen, but can contain one or more other gases useful in or not deleterious to the annealing procedure. For example, hydrogen gas can be used in combination with deuterium, and/or inert gases such as nitrogen, helium, argon or the like can be present. The annealing process can be conducted at atmospheric, subatomospheric or superatmospheric pressure, preferably at a temperature of at least about 200° C. up to the melting or decomposition temperature of other components of the device, more preferably in the range of about 200° C. to about 1000° C. In addition, once processing in the ambient is complete, the deuterium remaining in the ambient can be recovered for recycle and later use. For instance, the ambient can be combusted so as to form heavy water ($D_2O$), and the heavy water processed (e.g. by electrolysis or otherwise) to again form deuterium gas.

Other methods of providing deuterium at the semiconductor/gate insulator interface, or in other areas of a semiconductor device where a reduction in the degradation of device performance by hot carrier effects, may also be used without departing from the present invention. For example, atomic deuterium can be disposed at the desired location (e.g. interface) by ion or atomic deuterium implantation and annealing techniques (see e.g. U.S. Pat. Nos. 3,849,204 and 4,113,514) and/or can be trapped within layers of the semiconductor device during fabrication and thereafter caused to migrate to the interface (see e.g. U.S. Pat. No. 3,923,559). Moreover, during the initial stages of fabrication, the surface of the semiconductive substrate 12 can be conditioned to contain covalently bonded deuterium, for example by etching with a deuterium halide such as deuterium bromide, chloride or fluoride or by treatment with a deuterium plasma. The substitution of such treatments for those currently practiced, for instance hydrogen fluoride or bromide etching or hydrogen plasma treatment, will be well within the purview of those practiced in the field of semiconductor device fabrication. Such treatment will desirably result in deuterium atoms being covalently bonded to the surface atoms of the material from which the semiconductor is constructed (e.g. a Group III, IV or V element or mixture thereof), for example being directly bonded to atoms of such material (e.g. in the case of a Si—D bond), or bonded to such atoms through oxygen or another atom (e.g. in the case of an Si—O—D covalent bonding). Thus, in the case of a silicon semiconductor, such surface treatment processes will desirably populate the surface of the semiconductor with deuterium-silicon (D—Si) and/or deuterium-oxygen-silicon (D—O—Si) bonds. The treated semiconductor material can then be used to fabricate a semiconductor device.

The conditioning of the semiconductor device with deuterium has been found to significantly reduce effects associated with depassivation of the device by hot-carrier (e.g. hot-electron) effects. For example, as reported in the Experimental below, dramatic decreases in the degradation of threshold voltage and transconductance are observed when deuterium is used to passivate the devices, as compared to hydrogen passivation (see FIGS. 2 and 3, respectively). These decreases represent practical lifetime improvements by factors of about ten to fifty, and also make possible the operation of the semiconductor devices at higher voltages while better resisting aging due to hot electron effects.

6

In order to promote a further understanding and appreciation of the present invention and its advantages, the following experimental is provided. It will be understood that this experimental is illustrative, and not limiting, of the invention.

EXPERIMENTAL

1. Materials and Equipment

1.1 Wafers

The wafers used in these examples contained NMOS transistor structures fabricated using AT&T's 0.5 $\mu$m 3.3 volt CMOS technology generally as described in I. C. Kizilyalli and M. J. Thoma, et al., IEEE Trans. Semiconductor Manufacturing 8, 440 (1995), with the following changes. The gate oxide was reduced to $t_{ox}$~55 Å, the doping in the p-well was increased, and the phosphorous-doped LDD region was replaced by a shallow arsenic implanted (dose=$4\times10^{14}$ cm$^{-2}$ at 30 keV) source-drain extension region. With these modifications, the peak value for the source-drain peak electric field near the drain edge of the gate is enhanced, resulting in more channel hot electrons. The shallow source-drain extension insures that these hot electrons are near the $Si/SiO_2$ interface, where they will cause significant interface damage. The interface damage, caused by these hot carriers, can easily by observed by monitoring the changes in NMOS transistor transconductance (i.e. $g_m=\Delta I_{DS}/\Delta V_{GS}|_{V_{DS}}$) or by the shift in transistor threshold voltage $V_{th}$. See, J. M. Pembley et al in Advanced CMOS Process Technology, VLSI Electronics Microstructure Science, Vol. 19, Academic Press: San Diego, 1989.

1.2 Gases

Hydrogen, nitrogen and deuterium gases were obtained from S. J. Smith Welding Supply, Decatur, Ill., U.S.A. All gases were ultra high purity (UHP), 99.999% pure. The source of the deuterium gas was MG Industries of Morrisville, Pa., U.S.A.

1.3 Furnace Set-Up

Wafers were annealed using a two-zone Marshall muffle furnace set up for feed of nitrogen and either hydrogen or deuterium through the zones. Wafers were positioned on a sliding quartz tray and positioned with a quartz pushrod. Both zones of the furnace were set to the desired annealing temperature and then the rheostats of the wafer annealing zones were adjusted to achieve substantially constant temperature across the holding area of the quartz tray. This tray was positioned the same for each run. Temperatures were measured using a type K thermocouple fed into the furnace through an O-ring sealed stainless steel feedthrough on the furnace tube insert end caps. Another type K thermocouple was placed in an ice bath (deionized water) to serve as the zero ° C. reference. The temperature between the two thermocouples was measured using a PROTEK TM BOOK battery operated thermocouple meter. The furnace zones were connected to two Barber Coleman 570 temperature controllers which used the fixed thermocouples (10.5 inches from the furnace ends) for feedback. For gas flow, the ends of the furnace quartz tube insert were tapered ground glass joints for which mating glass end caps were fashioned. Because the ends of the tubes were well outside of the furnace, they were not hot and a gas tight seal could easily be formed using Teflon tape. A cylinder containing the hydrogen or deuterium was connected to the furnace gas tube with a Matheson Model 3122-350 two stage regulator with a metal diaphragm to preserve gas purity. The gases were plumbed to the quartz tube end cap by means of 304 stainless steel tubing. The nitrogen gas line was interfaced to the glass end cap by means of an O-ring sealed stainless steel quick connector. The hydrogen and deuterium gas lines

US 6,888,204 B1

7

shared a similar connector, with only one of these gases being connected at any given time to avoid the possibility of cross-contamination between the hydrogen and deuterium lines. As a further precaution, the deuterium gas line contained a series coil of copper tubing which was immersed in liquid nitrogen to remove any moisture that might otherwise introduce hydrogen into the furnace. During the anneal runs, the gas flowed through the zone of the furnace which did not contain the wafer samples before entering the wafer zone. In this manner, the gas was preheated, thereby not perturbing the wafer zone temperature. After exiting the wafer zone, the gas flowed out through a fitting on the opposite end cap and was then routed through a Matheson P6-1000 series flowmeter (0.1 through 2.0 standard liters per minute (SLPM) range). After the flowmeter, the gas was exhausted through a standard hood vent.

2. Annealing Runs

In all runs, nitrogen gas flow was set at 0.55 SLPM. To achieve an ambient containing about 10% by volume hydrogen or deuterium gas, the pressure was increased to about 0.61 SLPM by opening the hydrogen or deuterium gas regulator. In a first run, wafer samples were annealed in an ambient of 10% deuterium in nitrogen for a period of about 1 hour. The temperature was maintained at about 400° C. In a second run, wafer samples were annealed in a 10% by volume hydrogen in nitrogen ambient for a period of about 1 hour at a temperature of about 400° C. Devices on the resulting wafers were subjected to electrical stress testing. In particular, accelerated hot carrier DC stress experiments were performed on transistors with varying gate lengths (0.5 $\mu$m to 15 $\mu$m) at peak substrate current conditions. The applied stress voltages were $V_{DS}$=5V and $V_{GS}$~2V. Pre-stress transistor measurements demonstrate that devices sintered in hydrogen and deuterium have identical electrical characteristics (e.g. transconductance, threshold voltage, substhreshold-slope, saturation current, and the like).

FIG. 2 shows the transconductance degradation as a function of stress time for NMOS transistors with five gate lengths ranging from 0.5 to 0.7 $\mu$m. In FIG. 3 the threshold voltage increase as a function of stress time is shown for the same devices. As can been seen, wafers sintered in a deuterium ambient exhibit dramatically higher levels of resilience to channel hot carrier stress. In further comparative study, about 80 additional transistors were similarly stressed, and the same strong trend was observed. These results show that if 20% transconductance degradation is taken as a practical lifetime criteria, transistors sintered in deuterium typically exhibit lifetimes 10 times longer than those sintered in hydrogen. A factor of 10 improvement in lifetime is also inferred if a shift of 100 mV (or 200 mV) in threshold voltage is taken as the degradation criteria.

While the invention has been illustrated and described in detail in the foregoing description, the same is to be considered as illustrative and not restrictive in character, it being understood that only the preferred embodiments have been described and that all changes and modification that come within the spirit of the invention are desired to be protected. In addition, all publications cited herein are indicative of the level of skill in the art and are hereby incorporated by reference as if each had been individually incorporated by reference and fully set forth.

What is claimed is:

1. A semiconductor device comprising an n-channel field effect transistor including a drain formed in a semiconductive layer, a source formed in said semiconductive layer, a channel extending between the drain and the source, a gate insulating layer over said channel, an interface between a

8

semiconductive silicon layer and a gate insulating layer, and conductive contacts to said drain, source and on said gate insulating layer, said field effect transistor structurally characterized by the retention or deuterium at said interface resulting from post-fabrication passivation of said interface in a heated, deuterium gas-enriched atmosphere at a temperature above about 200° C. so as to increase the resilience of the field effect transistor to hot electron effects during operation.

2. The semiconductor device of claim 1 wherein said gate insulating layer comprises silicon dioxide.

3. The semiconductor device of claim 1, which is encapsulated.

4. The semiconductor device of claim 1, wherein said gate insulating layer comprises an oxide of silicon.

5. The semiconductor device of claim 1 wherein said gate insulating layer comprises silicon dioxide or silicon oxy nitride.

6. A semiconductor device comprising an n-channel field effect transistor having an interface between a semiconductive silicon layer and a gate insulating layer having a thickness not exceeding about 55 Angstroms, a drain formed in said semiconductive silicon layer, a source formed in said semiconductive silicon layer, a channel extending between the drain and the source, said gate insulating layer over said channel, said interface between said gate insulating layer and said channel, and conductive contacts for said drain, said source and said gate insulating layer; said semiconductive device structurally characterized by post-fabrication heating of the device after formation of at least said gate contact, in a deuterium gas-enriched atmosphere at a temperature above about 200° C. to provide deuterium at and to passivate said interface so as to increase the resilience of the field effect transistor to hot electron effects.

7. The semiconductor device of claim 6 wherein said gate insulating layer comprises silicon oxide.

8. The semiconductor device of claim 6, wherein said gate insulating comprises silicon oxynitride.

9. The semiconductor device of claim 6, comprising deuterium atoms from said post-fabrication passivation covalently bonded at said interface.

10. A semiconductor device comprising a field effect transistor having a gate dielectric film having a thickness not exceeding about 55 Angstroms disposed between a transistor gate contact and a semiconductive layer that includes doped source and drain regions and contacts to said doped source and drain regions, said semiconductor device structurally characterized by a concentration of deuterium in said gate dielectric film at an interface with said semiconductive layer provided by heating the device, after formation of said source, drain and gate contacts, at a temperature of about 400° C. for about one hour in an atmosphere comprising about 10% deuterium and about 90% nitrogen, said transistor device susceptible to degradation associated with hot carrier stress, and said concentration of deuterium increasing the resilience of the field effect transistor to channel hot carrier stress.

11. A semiconductor device according to claim 10 wherein the semiconductive layer comprises silicon, and the gate dielectric film includes a silicon compound.

12. A semiconductor device according to claim 11 wherein said silicon compound comprises an oxygen or a nitrogen containing silicon compound.

13. A semiconductor device comprising a field effect transistor having an interface between a semiconductive silicon layer and a gate insulating layer, structurally characterized by the gate insulating layer having a thickness not

**Federal Circuit Appendix**

**A108**

US 6,888,204 B1

**9**

exceeding about 55 Angstroms and by the presence of deuterium at said interface resulting from post-fabrication passivation of said interface in a heated, deuterium gas-enriched atmosphere at a temperature above about 200° C. so as to increase the resilience of the field effect transistor to hot electron effects, said post-fabrication passivation being conducted sufficiently to provide to said transistor a practical lifetime at least about ten times that provided by a corresponding passivation with hydrogen, wherein practical lifetime is taken as 20% transconductance degradation as a result of electrical stress.

**14**. A semiconductor device comprising an NMOS field effect transistor having an interface between a semiconductive silicon layer and a gate insulating layer, a drain formed in said semiconductive silicon layer, a source formed in said semiconductive silicon layer, a channel extending between the drain and the source, said gate insulating layer over said channel, said interface between said gate insulating layer and said channel, and conductive contacts for said drain, said source and said gate insulating layer; said semiconductive device structurally characterized by said gate insulating layer having a thickness not exceeding about 55 Angstroms and by annealing of the device after formation of at least said gate contact, in a deuterium gas-enriched atmosphere at a temperature above about 200° C. to provide deuterium at

**10**

said interface between said gate insulating layer and said channel to passivate said interface so as to increase the resilience of the field effect transistor to hot electron effects.

**15**. An improved semiconductor device including an insulated gate field effect transistor device having a transistor gate and a gate insulator film not exceeding about 55 Angstroms thickness interposed between said transistor gate and a channel of said transistor device, said transistor device including source, drain and gate contacts, and a concentration of deuterium introduced into and remaining said interposed gate insulator film, said transistor device susceptible to degradation associated with hot carrier stress, said concentration of deuterium substantially reducing said degradation associated with said hot carrier stress.

**16**. An improved semiconductor device according to claim **15**, wherein said gate insulator comprises an oxide of silicon.

**17**. An improved semiconductor device according to claim **15**, wherein said gate insulator comprises silicon oxynitride.

**18**. An improved semiconductor device according to claim **15**, wherein the field effect transistor comprises an n-channel device subject in operation to hot electron stress.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 6,888,204 B1                                      Page 1 of 1
DATED          : May 3, 2005
INVENTOR(S)    : Joseph W. Lyding and Karl Hess

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 8,
Line 4, change "retention or" to -- retention of --.

Column 10,
Line 10, insert -- in -- after "remaining".

Signed and Sealed this

Twentieth Day of December, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of July, 2014, I electronically filed the foregoing BRIEF OF APPELLANT THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS using the CM/ECF system of the Court, which will send a notice of electronic filing to the following counsel of record:

Ruffin B. Cordell   cordell@fr.com
Timothy W. Riffe   riffe@fr.com
Adam Shartzer   shartzer@fr.com

Appellant will hand deliver six paper copies of this document, as filed with the CM/ECF system of the Court, to the Clerk of the Court of Appeals for the Federal Circuit in Washington D.C. pursuant to ECF-10(B).


*/s/ George C. Summerfield*
George C. Summerfield

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 2,418 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

July 29, 2014                                          */s/ George C. Summerfield*
                                                        George C. Summerfield